257 F.2d 201
 SECURITIES AND EXCHANGE COMMISSION, Appellant,
v.
VARIABLE ANNUITY LIFE INSURANCE COMPANY OF AMERICA, Inc., and Equity Annuity Life Insurance Company, Appellees.
NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., Appellant,
v.
VARIABLE ANNUITY LIFE INSURANCE COMPANY OF AMERICA, Inc., and Equity Annuity Life Insurance Company, Appellees.
 No. 14253.
 No. 14254.
 United States Court of Appeals District of Columbia Circuit.
 Argued April 30, 1958.
 Decided May 22, 1958.
 Certiorari Granted October 13, 1958.
 
 See 79 S.Ct. 63.
 Mr. Myer Feldman, Special Counsel, Securities and Exchange Commission, with whom Messrs. Thomas G. Meeker, General Counsel, Securities and Exchange Commission, and Pace Reich, Attorney, Securities and Exchange Commission, were on the brief, for appellant in No. 14,253.
 Mr. John H. Dorsey, Washington, D. C., with whom Messrs. John W. Lindsey, Bolling R. Powell, Jr., and Edward G. Howard, Washington, D. C., were on the brief, for appellant in No. 14,254.
 Messrs. James M. Earnest, Washington, D. C., and Roy W. McDonald, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for appellee Variable Annuity Life Ins. Co. of America, Inc.
 Mr. Benjamin H. Dorsey, Washington, D. C., with whom Messrs. Smith W. Brookhart and Ralph E. Becker, Washington, D. C., were on the brief, for appellee Equity Annuity Life Ins. Co.
 Before WILBUR K. MILLER and DANAHER, Circuit Judges, and MADDEN, Judge, United States Court of Claims.*
 MADDEN, Judge.
 
 
 1
 Securities and Exchange Commission, (SEC), brought suit in the District Court seeking an injunction restraining Variable Annuity Life Insurance Company of America, Inc., (VALIC), from selling or offering for sale certain contracts or policies unless and until the contracts or policies were registered with SEC in accordance with section 5 of the Securities Act of 1933, 48 Stat. 74, 77, 15 U.S.C.A. § 77e, and unless VALIC complied with section 7(a) of the Investment Company Act of 1940, 54 Stat. 789, 802, 15 U.S. C.A. § 80a-7(a). On their own motions the National Association of Securities Dealers, (NASD), and the Equity Annuity Life Insurance Company, (EALIC), intervened on the sides of the plaintiff and the defendant, respectively.
 
 
 2
 The District Court dismissed the complaint, and the plaintiffs have appealed from that judgment. The original defendant and the intervening defendant sell the same kinds of contracts or policies. Those of VALIC will be discussed in this opinion.
 
 
 3
 The appellees contend that the contracts which they sell and which are the subject of this controversy are annuity policies and are therefore covered by the law relating to insurance, and not by the law relating to securities. They point to section 3(a)(8) of the Securities Act of 1933, 15 U.S.C.A. § 77c(a)(8) which says:
 
 
 4
 "Sec. 3. (a) Except as hereinafter expressly provided, the provisions of this title shall not apply to any of the following classes of securities:
 
 
 5
 * * * * *
 
 
 6
 "(8) Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia."
 
 
 7
 They point to section 3(c)(3) of the Investment Company Act of 1940, 15 U.S. C.A. § 80a-3(c)(3), which says that an insurance company is not an investment company within the meaning of the Act, and to section 2(a)(17) of that Act, 15 U.S.C.A. § 80a-2(a)(17) which says:
 
 
 8
 "(a) When used in this title, unless the context otherwise requires —
 
 
 9
 * * * * *
 
 
 10
 "(17) `Insurance company' means a company which is organized as an insurance company, whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies, and which is subject to supervision by the insurance commissioner or a similar official or agency of a State; or any receiver or similar official or any liquidating agent for such a company, in his capacity as such."
 
 
 11
 They point to the McCarran-Ferguson Insurance Regulation Act of March 9, 1945, 59 Stat. 33, 15 U.S.C.A. §§ 1011-1015, which says:
 
 
 12
 "* * * That the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
 
 
 13
 "Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
 
 
 14
 "(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after January 1, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
 
 
 15
 * * * * *
 
 
 16
 "Sec. 5. As used in this Act, the term `State' includes the several States, Alaska, Hawaii, Puerto Rico, and the District of Columbia."
 
 
 17
 Although VALIC sells what are undoubtedly life insurance contracts, they are tied in with its "annuity" contracts, and are a small part of its total business. If its "annuity" contracts are not annuity contracts within the meaning of the word annuity in the Securities Act of 1933, and within the contemplated business of insurance, as that word is used in the Investment Company Act and the McCarran-Ferguson Act, the "annuity" label which VALIC places upon its contracts will not avail it.
 
 
 18
 We lay aside the life insurance feature of the policies, and discuss the annuity feature. In fact, as we understand it, if the applicant for an annuity policy is insurable, for life insurance purposes, he must take at least a five year term life insurance policy. That seems to us to be irrelevant to the question of the nature of the predominant annuity feature of the policy. We will therefore discuss a naked deferred annuity policy such as would be issued by VALIC to one uninsurable for life insurance purposes.
 
 
 19
 The policy holder agrees to pay a fixed sum of money per year for each year until he reaches the age when his deferred annuity will begin to pay out. A considerable part of what he pays for the first year, and a smaller part of what he pays thereafter are taken by the company for selling and administrative expense and profit. The rest is invested, at the discretion of the company, in securities which, it is hoped, will produce an income or show a capital gain or both. The policy holder is given periodic statements showing what the company has bought with what he and the other policy holders have paid in. These are statements of his "accumulation units." If, for example, the common stocks which the company held at the time the policy holder paid his annual premium were cheap, he would acquire, for the dollars he paid in, a larger number of "accumulation units", since the price or value of the "accumulation units" would be determined by dividing the value of the company's holdings by the number of the units. If thereafter the value of the company's holdings increased, the policy holder would still have the same number of units, but the value of each unit would be higher. If the value of the holdings decreased, the result would, of course, be the opposite.
 
 
 20
 Throughout the paying-in period, the value of the policy holders' accumulations would fluctuate with the price of the securities in which the company invested its funds. The policy holder would hope that the long run trend of the prices would be upward. If so, "accumulation units" which he acquired in the early years for $1.00 might be worth $1.50 or $2.00 by the time his deferred annuity came due.
 
 
 21
 When the time comes for the company to begin to pay the deferred annuity, the policy holder acquires no more "accumulation units" since he will pay no more premiums. The number of "accumulation units" which he has acquired during the years of his payment of premiums will be multiplied by the then value of an accumulation unit, and that dollar amount will be the amount upon which his annuity will be computed. Using the mortality table appropriate to his age and sex, and assuming that 3½ percent interest can be earned upon the funds of the company until they are paid out, the dollar amount, per month, of his annuity is determined, and he is paid that amount for one month. The payments thereafter are determined according to the success of the company with its investments, and may be smaller or larger than the first month's payment. If the value of the "accumulation units", the number of which was fixed when the premium payments stopped, increases, the annuity payments will increase at that time to what they would have been if the units had had that value at the time the first month's annuity had been computed.
 
 
 22
 The arrangement is, of course, novel. It has been invented in an attempt to obviate the lack of reality of the traditional life insurance and annuity policy in relation to the value of the dollar. Annuity policies bought to provide a living in his latter years for the policy-holder annuitant, and life insurance policies bought to provide for the families of deceased policy holders have proved inadequate because of the decline of the value of the dollar in terms of purchasing power. Persons who have paid for life insurance or annuities have wished that they had bought, instead, tangible things or equities which would have, or might have, kept pace with the inflation of prices. There was room and need for experimentation in an effort to meet this serious problem. The contracts or "policies" offered by VALIC are an experiment in that direction. The question in this litigation is whether these contracts are "insurance" contracts, within the meaning of the statutes quoted above.
 
 
 23
 The Superintendent of Insurance of the District of Columbia, after due inquiry, issued to VALIC a certificate of authority "to transact within the District of Columbia the business of Life Insurance and Variable Annuities." Insurance Commissioners of three other States have issued similar licenses. The opinion of these officials, charged with the task of careful supervision of the business of insurance to protect the public from imposition, that the business of VALIC is the business of insurance, is important.
 
 
 24
 Elements of similarity between the "variable annuity" here in question and the traditional annuity may be noted. Both provide that the policy holder may elect at what time between certain stated ages, such as 50 and 70, the annuity payments are to begin. Both provide that the policy holder may cash in the value of his annuity before annuity payments begin. Both provide a loan value for the annuity contract. Both provide for the payment to beneficiaries in case of the death of the annuitant before annuity payments begin. Both provide that if the policy holder ceases paying premiums, a reduced annuity is nevertheless acquired for the payments he has made. Both provide options whereby payments may continue to another beneficiary after the death of the principal annuitant, and other options. Both have provisions making the annuity payments exempt from the claims of creditors.
 
 
 25
 It is apparent that the VALIC contract bears many resemblances to a conventional annuity policy. The appellants say that these resemblances are superficial; that the identifying quality of insurance is risk-shifting, and that in the VALIC contracts the policy holder bears his own risk, the risk that the company's investments of his premiums will increase or decrease in value. But perhaps the most important risk that the purchaser desires to shift when he buys an annuity is the risk that he will live longer than his funds will last. If everyone died on the day set for him by the mortality tables, there would be no point in paying an insurance company for doling out one's funds. A savings account, or Government or municipal or good corporate bonds, or a simple trust would do as well. VALIC, by the fact of issuing an annuity policy, does assume the risk of when the annuitant will die. If it does not bear the risk itself, it provides the machinery whereby the risk is shifted from the individual to the group of policy holders.
 
 
 26
 The appellants urge that VALIC policy holders, like investors in investment companies, may lose their savings and ultimately fail to receive the protection which they hoped to buy when they paid their premiums. That fact seems to us to be inherent in the nature of this experiment in annuity contracts. Holders of traditional annuity policies in Germany lost all their protection in the inflation of the twenties, and in France nearly all their protection in the post-war inflation. We have already adverted to the situation in this country. Experience in England has been similar.
 
 
 27
 The statutes which we have quoted above show an unmistakable determination on the part of Congress to leave the insurance business in the control of the States until Congress should in plain terms exert its power over some or all aspects of it. The appellants say that, by definition, the business of the appellees is not insurance. We find no such definition. The definitions in the Securities Act and the Investment Company Act indicate that if the insurance commissioner of a state subjects the business to his supervision, it is the business of insurance. The VALIC contracts have many qualities of the traditional business of insurance. They depart from the tradition only in their attempt to solve a problem badly in need of solution. Unless we confine insurance, by definition, to what has actually been done in the past under the name of insurance, and invent a new and distinctive name for this new business which so greatly resembles insurance, we should not contradict the insurance commissioners. The new business will need the expert and watchful supervision of these experts in insurance. We think the statutes lodge the responsibility with them.
 
 The judgment of the District Court is
 
 28
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Sitting by designation pursuant to provisions of Sec. 291(a), Title 28 U.S.Code